The Fish Net and Twine Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 7160. Promulgated January 22, 1947.

*Edward E. Burke, C. P. A.*, for the petitioner.

*Richard L. Shook, Esq.*, and *Jacquin D. Bierman, Esq.*, for the respondent.

## OPINION.

MURDOCK, *Judge*: The petitioner in its application for relief under section 722 mentioned subparagraphs (1), (2), (3), and (5) of section 722 (b). It abandoned at the hearing any claim for relief under subparagraphs (1) and (3). The facts and arguments which it presents require a consideration only of subparagraph (2), since no "other factor" for relief under (5) has been urged.

Section 722 is entitled "General Relief—Constructive Average Base Period Net Income." It states a general rule in paragraph (a). If a taxpayer establishes that the excess profits tax would otherwise result in an excessive and discriminatory tax and establishes also what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, then the tax must be determined by the latter method. Section 722 (b) (2) is as follows:

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess

profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \* \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

The petitioner does not clearly differentiate between a claim that its own business was depressed in the base period and a claim that the industry of which it was a member was depressed. The conditions to which it points affected the whole industry, and not the petitioner alone, so that its contention perhaps should be that the excess profits tax, without the benefit of section 722, is excessive and discriminatory, since its average base period net income is an inadequate standard of normal earnings because the domestic fish net industry, of which it was a member, was depressed in the base period by reason of temporary economic events unusual in the case of that industry, to wit, "a ruinous price war" with importers of Japanese fish nets during the base period years. However, at other times the petitioner seems to contend that its base period net income is an inadequate standard of normal earnings because its business was depressed in the base period as the result of temporary economic circumstances unusual in its case, to wit, "ruinous Japanese competition" in which fish nets were imported from Japan and sold at less than cost of similar domestic products. Both contentions will be discussed.

The record does not justify a finding that the domestic fish net industry was depressed in the base period. There is evidence to show the production in pounds of cotton fish nets by the industry during the years 1931 through 1935, for which the annual production was about 2,000,000 pounds. The president of the petitioner testified that the average annual domestic production of the same articles during the base years was approximately 2,500,000 pounds. No figures for other periods appear. This evidence tends to show that the industry was not depressed during the base period, measured by pounds of production. The record does not contain figures from which the dollar values of the production for the base period or the earnings could be compared with those of any other period.

The evidence shows that the petitioner and other domestic manufacturers had to meet competition from cheap Japanese goods and the petitioner and others failed to make some sales which might have been made if there had been no such competition. There is evidence of the amount in pounds of the Japanese importations and there is evidence of the percentage of the total domestic business done by the petitioner. It argues that its business was depressed because it lost

its proportionate part of the domestic demand filled by Japanese netting during the base period. The petitioner made a reduction in its prices in the latter part of 1938. The evidence would indicate that these reductions were in line with those made by other domestic producers at or about that time. The petitioner also makes some contention based upon an abortive claim that the customs authorities did not carry out the provisions of the Tariff Act imposing a 90 per cent ad valorem duty on imported fish netting but, instead, collected a duty of only 40 per cent.

It is not clear just how such an argument would aid the petitioner in any event. The petitioner has not shown that its low earnings or operating losses of the base period were due to Japanese competition. The volume of the petitioner's net sales and gross profits during the base period years was larger than for any prior period since 1930. Its net income or loss as adjusted for income tax purposes for the six years 1930 through 1935 shows a very large loss. The average amount paid during those years as officers' salaries was $16,230. Similar losses for the base period years were very much smaller despite the fact that the total salaries paid to the officers, who were likewise sole stockholders, were very much larger during the base period years than during the earlier period. Thus, these figures show that the petitioner was doing better in volume and financially in the base period years than in the prior years, despite increased salaries to its officer-stockholders. The only period during which the petitioner made substantial profits was that from 1925 through 1929. A comparison of the operations of the petitioner for that period with the base period would tend to show that the business was depressed during the base period, but the evidence does not show that the difference in results between the two periods was due to Japanese competition.

A reduction in prices does not necessarily lead to the conclusion that business was depressed. The evidence does not show the existence of a ruinous price war between the producers of domestic netting and importers of Japanese netting during the base period. There is no evidence that the petitioner or any other domestic producer engaged in such a war or sold any goods below cost during the base period. Failure to obtain additional sales is not synonymous with "depressed." The most that can be said for the petitioner on this record is that, if there had been no Japanese competition from 1932 through the base years, the petitioner and the domestic fish net industry generally would probably have been able to make some sales in addition to those which they actually made during all of those years in certain areas. Such evidence does not justify a conclusion that the business of the petitioner or the business of the industry of which it was a member was depressed because of Japanese competition, within the meaning

of the word "depressed" as used in section 722 (b) (2), when it is considered in the light of the other evidence, which indicates that the business of the petitioner, as well as that of the industry as a whole, was larger in the base period years than it had been for a number of years preceding. This is fatal to the petitioner's case, because it was incumbent upon the petitioner to show either that its business was depressed in the base period or that the industry was depressed.

If there had been no such failure of proof, the next burden of the petitioner would be to show that the alleged price war or competition resulting from cheap fish nets imported from Japan was a temporary economic event unusual in the case of this taxpayer or in the case of the industry as a whole. The evidence does not show that the competition through fish nets imported from Japan was temporary or unusual either in the case of the petitioner or in the case of the domestic fish industry. The competition had been going on for some time and the indications were at the end of the base period that it might be expected to continue indefinitely. The evidence does not show that there was any material change taking place or expected in the prices at which the Japanese goods were being sold or in the rate of duty to which they were subjected. The evidence was that the quality of the Japanese imports had been steadily improving until towards the close of the base period, at which time it was difficult to distinguish the domestic article from the imported one. Thus, as stated above, the indications were that the competition, which had been going on for a number of years and which had become well established, might be expected to continue indefinitely. The petitioner has failed in this aspect of the case also.

The Commissioner argues convincingly that there are other defects in the petitioner's proof, such as, for example, failure to show what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income. It is not necessary to consider other phases of his argument. The petitioner has not shown that it is entitled to any relief under section 722 (b) (2) or (5) because of any circumstances connected with competition resulting from the importation of Japanese netting during the base period years.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*